(Slip Opinion)

# Appointment of United States Trade Representative

Were it constitutional, 19 U.S.C. § 2171(b)(4) would prohibit anyone "who has directly represented, aided, or advised a foreign entity . . . in any trade negotiation, or trade dispute, with the United States" from being appointed as United States Trade Representative. A nominee's previous work on two matters involving antidumping or countervailing duty proceedings before administrative agencies would not be disqualifying under the statute, because neither matter was a "trade negotiation" or, during the time of his engagement, a "trade dispute[] with the United States."

March 13, 2017

MEMORANDUM OPINION FOR THE COUNSEL TO THE PRESIDENT*

You have asked for our opinion whether 19 U.S.C. § 2171(b)(4) (Supp. III 2015), if legally effective, would bar the appointment of Robert E. Lighthizer as United States Trade Representative. The provision, first enacted in 1995,[1] states that anyone "who has directly represented, aided, or advised a foreign entity (as defined by section 207(f)(3) of title 18) in any trade negotiation, or trade dispute, with the United States may not be appointed as United States Trade Representative or as a Deputy United States Trade Representative." In 1996, we concluded that the provision—then codified at 19 U.S.C. § 2171(b)(3)—"is an unconstitutional intrusion on the President's power of appointment and thus has no legal effect." Memorandum for John M. Quinn, Counsel to the President, from Christopher Schroeder, Acting Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of United States Trade Representative* at 1

---

* Editor's note: A copy of this opinion was provided to the Senate Committee on Finance before Mr. Lighthizer's March 14, 2017 confirmation hearing. *See Nomination of Robert E. Lighthizer: Hearing Before the S. Comm. on Finance*, 115th Cong. 3 (2017). The Consolidated Appropriations Act, 2017, made the statutory limitation discussed in this opinion inapplicable to "the first person appointed" as U.S. Trade Representative after May 5, 2017, "if that person served as" a Deputy U.S. Trade Representative before the limitation's 1995 enactment (as Mr. Lighthizer had). Pub. L. No. 115-31, div. B, § 541(a), 131 Stat. 135, 229 (2017). Six days later, the Senate provided its advice and consent to Mr. Lighthizer's appointment. *See* 163 Cong. Rec. S2906 (daily ed. May 11, 2017).

[1] *See* Lobbying Disclosure Act of 1995, Pub. L. No. 104-65, § 21(b), 109 Stat. 691, 704–05.

(July 1, 1996) ("1996 USTR Memorandum") (citation omitted).[2] President Clinton, however, had stated his intention, "as a matter of practice, to act in accordance with [the] provision" despite its unconstitutionality. Statement on Signing the Lobbying Disclosure Act of 1995 (Dec. 19, 1995), 2 *Pub. Papers of Pres. William J. Clinton* 1907 (1995). We therefore considered whether the provision, if effective, would have barred the proposed 1996 appointment, and we concluded that it would have. *See* 1996 USTR Memorandum at 3. Two years later, we addressed whether the same restriction would have barred the appointment of a Deputy United States Trade Representative, and we concluded that it would not have. *See* Memorandum for Charles F.C. Ruff, Counsel to the President, from Beth Nolan, Deputy Assistant Attorney General, Office of Legal Counsel, *Re: Appointment of Deputy United States Trade Representative* (June 25, 1998) ("1998 Deputy USTR Memorandum").

For similar reasons, we now conclude, on the basis of publicly available documents and other information you have provided about selected matters on which Mr. Lighthizer has worked, that, if section 2171(b)(4) were legally effective, his work on those matters would not be disqualifying under the statute.

# I.

Since 1985, Mr. Lighthizer has been in private practice, primarily handling a variety of international-trade matters on behalf of domestic entities, foreign governments, and other foreign entities. You have asked us to consider his work on behalf of two clients and to assume that each of those clients was a "foreign entity" as defined by 18 U.S.C. § 207(f)(3).[3]

---

[2] The portions of the 1996 USTR Memorandum addressing the constitutional question were published as *Constitutionality of Statute Governing Appointment of United States Trade Representative*, 20 Op. O.L.C. 279 (1996).

[3] As defined by 18 U.S.C. § 207(f)(3), "the term 'foreign entity' means the government of a foreign country as defined in section 1(e) of the Foreign Agents Registration Act of 1938, as amended, or a foreign political party as defined in section 1(f) of that Act." Under the cross-referenced provision, "'government of a foreign country' includes any person or group of persons exercising sovereign de facto or de jure political jurisdiction over any country, other than the United States, or over any part of such country, and includes any subdivision of any such group and any group or agency to which such

These matters involved Mr. Lighthizer's representation of Chinese or Brazilian entities in antidumping or countervailing duty proceedings before the Department of Commerce's International Trade Administration ("ITA") or the U.S. International Trade Commission ("ITC").

As relevant here, an antidumping or countervailing duty proceeding commences when an "interested party"—such as a company, a trade or business association, or a union—files a petition with both the ITA and the ITC contending that a domestic industry is injured or threatened by imports that are being sold in the United States at less than fair value or being subsidized by a foreign government. *See* ITC, *Antidumping and Countervailing Duty Handbook*, USITC Pub. 4540, at I-3 (14th ed. June 2015), *available at* https://www.usitc.gov/trade_remedy/documents/handbook.pdf ("*ITC Handbook*"); *see also* 19 U.S.C. §§ 1671a(b), 1673a(b), 1677(9). Upon receipt of a petition, the ITA must "notify the government of any exporting country named in the petition" and, in certain instances, "provide the government of any exporting country . . . an opportunity for consultations with respect to the petition." 19 U.S.C. §§ 1671a(b)(4)(A), 1673a(b)(3)(A). Each agency conducts a preliminary investigation and renders a preliminary determination, which may be followed by a final investigation and final determination by each agency. *See* 19 U.S.C. §§ 1671–1671h, 1673–1673h; *ITC Handbook* at II-3 to II-23. The ITA may impose antidumping or countervailing duties if the following two conditions are satisfied: (1) the ITA renders a "final determination" that dumping of goods below fair value has occurred or that an exporting nation has provided a countervailing subsidy with respect to the goods; and (2) the ITC renders a "final determination"—in what is referred to as the "injury phase" of the proceeding—that the importer's behavior materially injures, threatens to materially injure, or materially retards the establishment of, an industry in the United States. *See* 19 U.S.C. §§ 1671–1671h, 1673–1673h, 1677; *ITC Handbook* at II-14, II-24 to II-25.

After each agency's final determination is published, a party to the proceeding may "contest[] any factual findings or legal conclusions upon which the determination is based" by commencing a civil action in the U.S. Court of International Trade. 19 U.S.C. § 1516a(a)(1)–(2); *see*

---

sovereign de facto or de jure authority or functions are directly or indirectly delegated." 22 U.S.C. § 611(e).

28 U.S.C. § 2631(c).[4] In such an action, the United States is named as the defendant and is represented by either the Department of Justice or the ITC. *See* 28 U.S.C. § 516; 19 U.S.C. § 1333(g); *see, e.g.*, *Zhengzhou Harmoni Spice Co. v. United States*, 34 C.I.T. 40, 42 (Ct. Int'l Trade 2010) (observing that, in an action challenging a final administrative determination of the ITA, "the only necessary parties are the plaintiff[] and the defendant (*i.e.,* Commerce)"); *Shandong TTCA Biochemistry Co. v. United States*, 34 C.I.T. 582, 582 (Ct. Int'l Trade 2010) (counsel listing denoting that, in a challenge to an injury determination by the ITC, the ITC appeared "for Defendant United States").

## II.

As noted, the matters in question involved antidumping or countervailing duty proceedings before the ITA or ITC. We see no reason to believe that either matter was a "trade negotiation." Nor was either, during the period of Mr. Lighthizer's engagement, a "trade dispute[] with the United States" that would make his work disqualifying under section 2171(b)(4).

## A.

You have informed us that, between March and November 1991, Mr. Lighthizer represented the China Chamber of Commerce for Machinery and Electronics Products by "assisting another partner [at his law firm] with respect to the injury phase of U.S. antidumping litigation [i.e., an ITC investigation] regarding certain electric fans from China." In December 1991, shortly after Mr. Lighthizer's own involvement ended, the ITC issued its final determination of material injury to U.S. fan manufacturers. *See Certain Electric Fans from the People's Republic of China*, Inv. No. 731–TA–473, USITC Pub. 2461 (Dec. 1991) (Final).

In 1996, we briefly discussed the meaning of a "trade dispute[] with the United States" under what was then 19 U.S.C. § 2171(b)(3). We explained that, "within the ordinary meaning of the statutory language, advice about dissolving a trade agreement [between the United States and a foreign

---

[4] For goods coming from Canada or Mexico, the administrative determinations of the ITA and the ITC are subject to review by a "binational panel," selected by the governments involved. *See* 19 U.S.C. §§ 1516a(g)(8), 3432(a)(1)(D)–(E).

country] would concern a 'trade dispute,' albeit a dispute that might be averted." 1996 USTR Memorandum at 5. But we reserved the question "whether the statutory bar is triggered by . . . work on countervailing duty cases . . . in administrative fora." *Id*. at 5 n.4. We considered the latter question in 1998, concluding that while an antidumping or countervailing duty matter was pending before the ITA, "the dispute was not 'with' the United States, as we interpret that term in the statute." 1998 Deputy USTR Memorandum at 2.[5]

We reaffirm that reasoning here and confirm that it is equally applicable to work performed during an antidumping or countervailing duty investigation by the ITC. As we explained in 1998, "[w]e read the word 'with,' in this context, as meaning 'in opposition to' or 'against' the United States." 1998 Deputy USTR Memorandum at 2 (citing *Webster's Third New International Dictionary* 2626 (def. 1a) (1993)). That is the well-settled meaning of the term *with* when used in the context of a dispute. *See* 20 *Oxford English Dictionary* 443 (2d ed. 1989) (def. 2: "Of conflict, antagonism, dispute, injury, reproof, competition, rivalry, and the like: In opposition to, adversely to: = AGAINST"). Thus, a foreign entity is in a trade dispute "with" the United States only if that entity's position is in opposition, or adverse, to that of the U.S. Government.[6]

---

[5] The nominee at issue in the 1998 Deputy USTR Memorandum disclosed to the Senate that she had previously worked on behalf of a foreign governmental entity during an ITA proceeding. *See Nominations of Susan G. Esserman, Timothy F. Geithner, Gary S. Gensler, Edwin M. Truman, & David C. Williams: Hearing Before the S. Comm. on Finance*, 106th Cong. 42 (1999). Although the statutory prohibition was neither modified nor waived, the Senate gave its advice and consent to her appointment.

[6] The plain meaning of the statutory text is reinforced by a structural consideration. In the same section of the 1995 statute that restricted the range of permissible appointees, Congress also removed the time limit on the post-employment restriction that forbids a former U.S. Trade Representative or Deputy U.S. Trade Representative from representing, aiding, or advising a foreign entity "with the intent to influence a decision of" an officer or employee of the United States. 18 U.S.C. 207(f)(1)–(2); *see* Lobbying Disclosure Act § 21(a), 109 Stat. at 704. Congress could have used such a formulation in section 2171 if it had intended to exclude from the class of Trade Representative appointees not just those who have opposed a final determination of the ITA or the ITC but also those who have appeared before those agencies with "the intent to influence" their officers or employees before such determinations have been made. In comparison, section 2171(b)(4) seems "designed to reach a narrower category of activities, of a more directly adversarial nature." 1998 Deputy USTR Memorandum at 2.

The kinds of ITA and ITC administrative proceedings at issue here do not present such circumstances. Although the proceedings are adversarial in nature, the United States is not one of the adversaries. Instead, when the agencies conduct their investigations, each one is still deciding, on behalf of the U.S. Government, whether to side with the petitioners representing domestic industries or with the foreign respondents. *Cf. Sys. Application & Techs., Inc. v. United States*, 691 F.3d 1374, 1385 (Fed. Cir. 2012) (characterizing the ITA's "role" as that of "a neutral arbiter in trade disputes"). An antidumping or countervailing duty investigation may be correctly described as a "trade dispute[] *before* the agency." *JBF RAK LLC v. United States*, 991 F. Supp. 2d 1343, 1355 (Ct. Int'l Trade 2014), *aff'd*, 790 F.3d 1358 (Fed. Cir. 2015) (emphasis added). But the foreign respondent in an investigation initiated at the behest of a petitioner does not have a dispute "with" the agency any more than a party in a district court proceeding has a dispute "with" the court.

When the ITA and the ITC have rendered their final determinations and one of the parties seeks judicial review, the nature of the trade dispute changes. At that point, the agencies cease to be mere adjudicators. Their final determinations become the position of the United States, which becomes the defendant, directly adverse to the party challenging the decision (which may or may not be a foreign respondent). As we explained in 1998, the United States is then "a real party" before a court (or a binational panel) and may therefore find itself in a trade dispute "with" a foreign entity challenging the ITA's or ITC's determination. *See* 1998 Deputy USTR Memorandum at 3.

While we recognize that any proceeding before the ITA or ITC has the potential to become a "trade dispute with the United States," that outcome is contingent on the position that the agency, and hence the United States, ultimately adopts. If the ITA and the ITC find in the foreign entity's favor, the foreign entity will not be adverse to the United States. Instead, the domestic petitioner will be the one that has a trade dispute "with" the United States. Indeed, that is what happened in the Chinese-fan matter after Mr. Lighthizer's representation concluded. The judicial challenge to the ITA's final determination was filed by "a major American manufacturer of oscillating and ceiling fans." *Lasko Metal Prod., Inc. v. United States*, 810 F. Supp. 314, 315 (Ct. Int'l Trade 1992), *aff'd*, 43 F.3d 1442 (Fed. Cir. 1994). Some Chinese companies—but

apparently not the China Chamber of Commerce for Machinery and Electronics Products—intervened as defendants and "support[ed] the agency's decision." *Id*. at 315, 316.[7]

Accordingly, Mr. Lighthizer's representation of the China Chamber of Commerce for Machinery and Electronics Products, which ended before the ITC's final injury-phase determination, did not occur in a trade dispute with the United States and therefore would not disqualify him from appointment under section 2171(b)(4).

## B.

From October 1985 through February 1986, Mr. Lighthizer represented the Sugar and Alcohol Institute of Brazil (which was then part of the Brazilian Ministry of Industry and Commerce) in an effort to achieve a settlement of antidumping and countervailing duty proceedings. On the basis of publicly available information and the facts you have provided, we do not believe that Mr. Lighthizer's representation of the Institute would be disqualifying under section 2171(b)(4).

The relevant matters were initiated by petitions filed with the ITA and the ITC in February 1985. *See* ITC, Certain Ethyl Alcohol from Brazil, Inv. Nos. 701–TA–239 and 731–TA–248, USITC Pub. 1678, at 1 (Apr. 1985) (Preliminary). The ITA issued its final determination in February 1986, concluding that fuel ethanol imported from Brazil was being sold in the United States at less than fair value, and the ITC issued its final determination in March 1986, finding no injury or threat of injury to an industry in the United States. *See* Final Determination of Sales of Fuel Ethanol from Brazil at Less than Fair Value, 51 Fed. Reg. 5572 (Feb. 14, 1986) (ITA final determination); Certain Ethyl Alcohol from Brazil, Inv. Nos. 701–TA–239 and 731–TA–248, USITC Pub. 1818 (Mar. 1986)

---

[7] The situation here thus differs from one that led us to conclude that a potential appointee had given advice about a "trade dispute with the United States" when she advised a foreign government about the legal consequences of terminating its trade agreement with the United States. 1996 USTR Memorandum at 5. There, it was readily apparent that, should the foreign government decide to terminate the trade agreement, the termination would initiate an adversarial relationship—a dispute—with the United States. We indicated that any advice prepared for the purposes of informing the foreign government's termination decision was therefore inseparable from the anticipated trade dispute with the United States.

(Final). More than two months after Mr. Lighthizer's last involvement in these matters, a challenge to the ITA's determination was filed in the Court of International Trade. *See Internor Trade Inc. v. United States*, 10 C.I.T. 472, 472 (Ct. Int'l Trade 1986) (complaint filed on May 20, 1986); *see also Internor Trade, Inc. v. United States*, 651 F. Supp. 1456 (Ct. Int'l Trade 1986).

The November 1985 representation agreement provided that lawyers from a different firm would "continue representing the government of Brazil and the producers in the above mentioned pending antidumping and countervailing duty cases," while Mr. Lighthizer's firm would "assist them to the extent possible in the defense of such cases." Skadden, Arps, Slate, Meagher & Flom, Registration Statement Pursuant to the Foreign Agents Registration Act of 1938 as Amended, Registration No. 3746, app. (Dec. 3, 1985). The representation was expected to "involve legal inter-pretations and advice, the drafting of legal documents and briefs, strategy sessions, as well as numerous meetings with administration, congressional and U.S. business interests." *Id*. Mr. Lighthizer was named in the agree-ment and signed it on behalf of the firm. *Id*. Even assuming that he was involved in both the ITA and the ITC proceedings, for the reasons set forth above, his activities—which occurred during the administrative stage, in which each federal agency was an adjudicator rather than a party—did not involve a trade dispute "with" the United States.

The registration statement filed by Mr. Lighthizer's law firm in De-cember 1985 stated more generally that the firm intended to "provide general legal services related to settlement of *disputes between Brazil and the United States* involving the trading of ethanol" and that, in the course of the engagement, the firm could communicate on behalf of its client with both Congress and "executive agencies." Skadden, Arps, Slate, Meagher & Flom, Exh. B to Registration Statement Pursuant to the Foreign Agents Registration Act of 1938 as Amended, Registration No. 3746 (Dec. 3, 1985) (emphasis added). Again, insofar as the "disputes" referred to in the registration statement as objects of potential settlement were the same disputes that were being litigated before the ITA and the ITC, we do not believe they qualify as trade disputes "with" the United States for the purposes of section 2171(b)(4). As explained above, at least until a party initiates a civil action in the Court of International Trade, any adversity is between the petitioners and the respondents in the administra-

tive proceedings, rather than "with" the United States. Because you have indicated that the "disputes" referred to in the above-cited materials were in fact the investigations that were pending before the ITA and the ITC, we believe that Mr. Lighthizer's representation in these matters would not be disqualifying under section 2171(b)(4).[8]

### III.

On the basis of the information you have provided and our review of publicly available documents, we conclude that, if 19 U.S.C. § 2171(b)(4) were legally effective, neither of the matters discussed above would bar Mr. Lighthizer's appointment as United States Trade Representative.

CURTIS E. GANNON
*Acting Assistant Attorney General*
*Office of Legal Counsel*

---

[8] Because we reach this conclusion, we need not determine whether Mr. Lighthizer was "directly represent[ing]" the Government of Brazil.